## Commonwealth v. Barnhart

*Rudolf M. Wertime*, district attorney, for Commonwealth.

*George S. Black* and *William C. Hazlett*, for defendants.

WINGERD, P. J., December 30, 1955.—Each of the above named defendants was severally indicted for violation of section 605 of The Penal Code of June 24, 1939, P. L. 872, 18 PS §4605, which provides as follows:

"Whoever sets up or establishes, or causes to be set up or established, any game or device of address, or hazard, at which money or other valuable thing may or shall be played for, or staked or betted upon; . . . is guilty of a misdemeanor. . . ."

The testimony was generally as follows: On August 21 and August 28, 1955, a State officer in plainclothes gained entrance to the home of defendant Seilhamer; the manner of gaining such entrance is unimportant. He there played craps on each date and, on August 28th, the place was raided by State officers and all equipment and $307.02 taken into their custody. The play on both August 21st and August 28th was generally the same, except that on August 21st both Goetz

and Aldinger covered bets and on August 28th Goetz covered bets. On August 21st when the State officer entered no play was in progress, but when he entered on August 28th play was in progress.

The State officer on both occasions went to the cellar which was well lighted and in which there was a billiard table with side boards attached. On the green cloth thereof was marked along each of the long sides, seemingly by chalk, a rectangle divided into six squares or spaces, numbered 4, 5, 6, 8, 9 and 10.

As above stated, when the State officer entered on August 21st, no play was in progress. Defendant Barnhart had five dice, red with white spots, and a cup or holder of leather or other material lined with felt. The playing of "craps" was started. Barnhart allowed a player to pick out two of the five dice. The player then bet by putting down money on the table and either Goetz or Aldinger covered the bet. Neither of them rolled the dice. If any other player wanted to bet on the player who had the dice he also put down his money and either Goetz or Aldinger covered his bet. The player with the dice then rolled his dice out on the table. If he rolled a 7 or 11 he won. If he rolled a 2, 3 or 12, the player lost. If he rolled one of the numbers in the squares referred to, he continued to roll to repeat that number, but if he rolled a 7 before he again rolled his first number, he lost his money and the dice. This is a general explanation of the procedure followed. However, there were some variations as to odds on certain numbers and the allowing a player to continue to roll for his first number if he threw a 7 immediately, which is called "bucking the dice". All these variations were explained fully by the State officer and appear in the record.

Barnhart put a penny on a player's first number in the proper square so there could be no mistake as to the number he was rolling for, he picked up the

dice when the play was finished and put them with the three he had and had the next player pick two from the five for his play, he pushed the money to the winner if it was not within easy reach of the winner. He was what is commonly known as the "stick-man". On August 21, he used a stick, which curved near the end, to rake in the dice but although he performed his duties on August 28, he does not seem to have used the stick.

On August 21, Goetz and Aldinger covered all bets and on August 28 Goetz covered all bets. Goetz referred to himself as the "bank" and Aldinger at one time, on August 28, said he would take the "bank" when Goetz seemed to be out of money. Also both Goetz and Aldinger told the State officer, "You can't get a bet on a man because the bank won't cover him unless you are on him when he comes out for a point." This meant that the bank wouldn't cover a person's bet on a player who was rolling to repeat his first number, unless the person had bet with the player before his first roll. If he then bet he could bet on the player rolling for his number and if it was a number that took odds, the bank would have to cover the bet at odds. At the time of the raid Goetz, not knowing the State officer, asked him to state it was a "head to head game" and not a bank game. A "head to head game" is when players bet against each other and there is no bank. Both Aldinger and Goetz asked the officer of the raiding why they were held as they were only players.

Defendant Homer was present August 28, stood near Goetz who was covering all bets and supplied him with some money to cover bets. He was leaving to get more money, as Goetz had been losing, when the raid took place.

We have not attempted to go into details but merely to state generally the evidence.

There was evidence from which the jury could find that Seilhamer had set up the crap table in his home and was collecting a dollar from each player "for the house", that he collected it from the State officer on August 21 saying, "This is for the house" and on August 28 saying, "We didn't get your dollar yet", that he said to the raiders when they were dismantling the billiard table, he wouldn't have fixed it up if he knew this was going to happen, it having been changed between August 21 and 28 by attaching higher side boards lined with a sort of rubberized leather.

There was evidence from which the jury could find that Goetz and Aldinger acted as bankers, neither playing on August 21 or August 28, and that Homer aided Goetz in banking on August 28.

There was evidence from which the jury could find that Barnhart was the "stick-man" handling the dice and the cup, placing the pennies on the right numbers and pushing the money to the winners and that he did not play on August 21 or 28.

The players were guilty of gambling but were not violating section 605 of The Penal Code.

Defendants were all tried together before one jury and were each found guilty. Each filed a motion in arrest of judgment on the ground that there was not sufficient evidence to sustain the verdict of guilty, each having demurred to the evidence and after the evidence was closed, no evidence having been presented by defendants, filed a point for binding instructions of not guilty, and a motion for a new trial on the ground that the court had improperly defined "setting up" or "establishing", "Any game or device of address, or hazard, at which money or other valuable thing may or shall be played for, or staked or betted upon", and that the court's charge was argumentative in favor of the Commonwealth and was tantamount to an instruction to find defendants guilty. Their conten-

tion as to the meaning of "establish" is that it must be shown "that the defendants initially arranged for or implemented the arranging for a session of play" and that there was no evidence that Barnhart, Goetz, Aldinger or Homer did any more than take part in a session of playing "craps", that nothing was shown that they arranged for or implemented the arranging of such session, that the word "establish" has no implication of continuance.

On August 21 no play was going on when the State officer went to the cellar. He said, "They were just setting there until we came down". When play started it was, even under defendants' contention, the beginning of a session of play which was established by Seilhamer having the table set-up, by Barnhart acting as stick-man and Goetz and Aldinger acting as bankers. All aided and abetted in the establishing of the play.

The court explained to the jury the offense, with which defendants were charged, is a misdemeanor and that all who aided and abetted in perpetrating the prohibited act were guilty as principals and also explained that the players were gambling but were not guilty of the offense of establishing a game or device of hazard.

The court charged the jury that "establish" has more a meaning or implication of permanence and continuance than "set-up" (see Commonwealth v. Carson, 6 Phila. 381-383), and that if, under that definition, Seilhamer had set up the table and Barnhart was stick-man and Goetz and Aldinger were bankers they were aiding and abetting in establishing as a continuing operation a game or device of hazard. But if the limited definition of the word "establish" was applied, that is, to set up or start, then each time a player lost the dice and the board was cleared of money and the dice handed to the stick-man a game

or device of hazard was ended and when the next player picked two dice from the five held by the stick-man, placed his bet, which was covered by the bank, and rolled his dice, a new game was begun and it was established by the table being available, the stick-man's handling of the dice and the bank covering the bet or bets. In connection with this, after exceptions were taken to parts of the court's charge, the court stated to the jury:

"Members of the jury, if I used the word conducted at one place in my charge, I think, "conducted the game," the Court will correct that to use the word "establish", as the Court defined it to you from the Act in that the word "set-up" or "establish" could very easily have a meaning of merely setting up something and leaving it there, or, it says, "or establish". That "establish" has a more, you might say, meaning of permanence and continuance than the word "set up", and if at any time in my charge I said definitely that Mr. Barnhart, Goetz and Aldinger established the game, why that was for you, under the instructions of the Court to finally determine, and I wasn't deciding it for you. And so far as the passing the dice from player to player, the Court stated that if you found that was, each time, a new game, then when the new game started, that would clearly be establishing a new game, even in the restricted sense of the word "establish". And if I stated that Barnhart, if he did these things which he did with the stick and handing of the dice and the other matters, if he did those, then he did aid and abet in establishing the game, I say to you, it is for you to decide whether or not the game was established there and whether or not those acts of Barnhart would aid or abet in the establishment of the game, as the Court has defined it to you.

"And when I stated that Mr. Homer, when he gave, if you believe he gave, money to Mr. Goetz, and you

find that Mr. Goetz, under the charge of the Court, was establishing the game or aided and abetted in establishing the game, either as continuing or if you find that each time the player, as they say, passed, it was a new game, if you find that, and that Mr. Homer was aiding and abetting Mr. Goetz in doing that, then he would be guilty of establishing the game; but that is for you to decide."

The court time and again left the truth of the testimony and the final determination of the case to the jury. In the court's opinion, the charge was not unfair to defendants.

The main contention of defendants is the incorrectness of the court's definition of a game or device of hazard, that is, that in playing craps each time a player loses the dice and another play starts by another player taking the dice to roll and new bets are made there is a new game of hazard. There has been no mention made to this court of any rule or definition as to what constitutes a unit game of craps, such as nine innings or more in baseball or so many sets in tennis or time in football or basketball, etc. At each pass of dice, in the playing of craps with a bank, the players may change and the bank may change, new bets are made, a new game of hazard is commenced.

Although no case in Pennsylvania has been cited which clearly follows this reasoning neither has any been cited which is to the contrary. In other States the reasoning of the court finds support. See Parks v. State, 57 Tex. Crim. 569, 123 S. W. 1109; Johnson v. Commonwealth of Kentucky, 201 Ky. 314, 256 S. W. 388, 35 A. L. R. 86 and note 89-91.

We cannot believe the legislature intended to restrict the word "establish" in the way contended for by defendants. How could it be proven when and by whom the initial arrangements for a gambling game

were made? It might have been years before. A statute must be interpreted reasonably so as to obtain the result intended by the legislature.

The foregoing is the court's opinion in support of its decree and order filed December 27, 1955.